Dominick Bratti, Esq. – (DB6123)
Annemarie T. Greenan, Esq. – (AG5486)
BRATTI GREENAN LLC
1040 Broad Street, Suite 104
Shrewsbury, NJ 07702
(732) 852-2711
Attorneys for Plaintiff,
Independent Laboratory Employees' Union, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

-------------------------------------------------------X
                   :

INDEPENDENT LABORATORY
EMPLOYEES' UNION, INC.,           :      Civil Action No.:

         Plaintiff,           :     **VERIFIED COMPLAINT**

v.                   :

EXXONMOBIL RESEARCH AND    :
ENGINEERING COMPANY

        Defendant.          :

-------------------------------------------------------X

     Plaintiff, the Independent Laboratory Employees' Union, Inc. (the "ILEU" or "Plaintiff"), by way of verified complaint against Defendant, ExxonMobil Research and Engineering Company ("Exxon" or "Defendant"), states as follows:

### NATURE OF THE ACTION

     1.    This action seeks the entry of a judgment confirming an arbitration award and entering judgment in favor of Plaintiff and against Defendant on that award.

     2.    The award was entered by Arbitrator Joyce M. Klein and delivered to the parties on May 25, 2018.

3.     The award is denominated as the Arbitration Award in an arbitration proceeding captioned "In the Matter of Arbitration between Independent Laboratory Employees' Union, Inc., Union, and ExxonMobil Research and Engineering Company, Inc. Company," Grievance No. 15-190.

## THE PARTIES

4.     Plaintiff is a labor organization which is the exclusive representative of certain Exxon employees who are based at the Defendant's Clinton, New Jersey facility.

5.     Defendant is a corporation with a facility located in Clinton, New Jersey.

6.     Plaintiff and Defendant have been parties to a collective bargaining agreement covering represented employees for many years.

## BACKGROUND

7.     The parties are currently negotiating a new CBA and have agreed to extend their June 1, 2013 agreement beyond the June 1, 2018 expiration date.

8.     The CBA contains an arbitration provision which provides that "[t]he decision of the Arbitrator shall be final and binding on the Company and the Union, unless it is contrary to law, and shall conclusively determine the disputed question for the life of this Agreement, or any renewal or renewals thereof."

9.     Article I Section 2 of the CBA provides that the Company recognizes the Union as the exclusive bargaining representative for all job classifications identified in Exhibit II to the CBA.

10.     The CBA allows the Company to utilize subcontractors under Article XVIII.

11.    In this regard, in the past, the Company utilized contract / agency employees on a temporary basis to meet operational needs.

12.    The Company changed its practice with respect to subcontracting.

13.    Rather than utilizing contract / agency employees on a temporary basis to meet operational needs, the Company has decided to permanently replace entire job classifications with contract workers.

14.    The Company's utilization of contractors to permanently replace entire job classifications with contractors represented a drastic break with this history, and with prior arbitration decisions interpreting the applicable provisions of the CBA.

15.    The Company's action would result in lost recognition for entire job families and an impermissible eroding of the bargaining unit.

16.    As a result, Plaintiff filed a grievance, and the parties proceeded to binding arbitration before a neutral arbitrator of the American Arbitration Association to determine whether Exxon violated the CBA by changing its subcontracting practice by permanently filling certain bargaining unit positions with contractors, and if so, what shall the remedy be.

17.    The Union also filed an unfair labor practice charge with the National Labor Relations Board (NLRB) alleging that the Company violated Section 8(a)(5) of the National Labor Relations Act (NLRA) by replacing Union employees in bargaining unit positions with contractors supplied by third-party joint employers without paying union wages/benefits or recognizing the Union as the bargaining unit representative of said employees.

18.    The Union further alleged that the Company violated the NLRA in that it admits that the affect/purpose of its plan/conduct is to eliminate the Union as the sole bargaining

representative for the employees / positions involved and ultimately convert the positions to completely non-unionized positions.

19.     The unfair labor practice charge was deferred to the existing arbitration.

20.     Arbitration hearings were conducted on August 4, 2016 in Branchburg, New Jersey and October 18, 2017 in Annadale, New Jersey.

21.     The record was closed upon receipt of post-hearing briefs on February 20, 2018.

22.     Following the hearings and post-hearing briefs, the arbitrator sustained the Union's grievance finding that the Company violated the CBA when it permanently filled bargaining unit positions with contractors.

23.     The arbitrator determined that both Article XVIII and the Recognition Clause prohibit the permanent contracting of these positions.

24.     The arbitrator ordered that, as remedy, the Company shall cease and desist from permanently contracting out bargaining unit positions at its Clinton, New Jersey facility.

25.     The award was entered by Joyce M. Klein and delivered to the parties on May 25, 2018.

26.     A true and correct copy of the Arbitration Award is attached hereto as Exhibit A.

## COUNT I
### (Confirmation of the Arbitration Award)

27.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 24 of this Complaint as if fully set forth herein.

28.     Pursuant to 9 U.S.C. §9, Plaintiff is entitled to confirmation of the Arbitration Award.

WHEREFORE, Plaintiff requests that the Court enter judgment:

(a) Confirming the Award;

(b) Entering judgment on the Award;

Requiring Defendant shall cease and desist from permanently contracting out bargaining unit positions at its Clinton, New Jersey facility.

(c) Awarding Plaintiff its reasonable attorneys' fees and costs incurred in seeking confirmation of the Award; and

(d) Granting Plaintiff such other and further relief as the Court deems just and proper.


BRATTI GREENAN LLC
Attorneys for Plaintiff,
Independent Laboratory Employees' Union

By: _____
ANNEMARIE T. GREENAN
DOMINICK BRATTI
For the Firm

Dated:  June 20, 2018

5

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I certify that to the best of my information, knowledge and belief, the matter in controversy is not the subject of any other pending or contemplated action or arbitration in any other court or proceeding, other than the arbitration proceeding captioned "Independent Laboratory Employees' Union, Inc., Union, and ExxonMobil Research and Engineering Company, Company," Grievance No. 15-190, and that no other parties should be joined in the above action at this time.

BRATTI GREENAN LLC
Attorneys for Plaintiff,
Independent Laboratory Employees' Union

By: _____
ANNEMARIE T. GREENAN
DOMINICK BRATTI
For the Firm

Dated: June 20, 2018

## VERIFICATION

I, Michael Myers, of full age, being duly sworn according to law do hereby swear:

I am President of Plaintiff Independent Laboratory Employees' Union ("ILEU"). I have read the contents of the annexed Verified Complaint and verify that the statements contained therein are true to the best of my knowledge and belief. I am aware that if any of the statements contained in the Verified Complaint are willfully false, I am subject to punishment.

Dated: _6/20/18_, New Jersey
June _20_, 2018

_Michael S. Myers_
MICHAEL MYERS

Sworn and subscribed to
before me this _20_ day of
_June_, 2018

_[signature]_
Notary Public

Lenka McCaa
Notary Public
New Jersey
My Commission Expires 4-21-19
No. 2445489
Notary for Michael Myers only

7

# EXHIBIT A

In the Matter of the Arbitration Between:

**INDEPENDENT LABORATORY EMPLOYEES'
UNION, INC.**

"Union"

-and-

**EXXONMOBIL RESEARCH & ENGINEERING
COMPANY, INC.**

"Company"

Grievance No. 15-190

## OPINION AND AWARD

**Before
Joyce M. Klein
Arbitrator**

**Appearances:**

**For the Union:**
Dominick Bratti, Esq.
Budd Larner, P.C.

**For the Company:**
Kimberly D. Pilcher, Esq.
Amy M. Luisgnan, Esq.
ExxonMobil Corp.

The Independent Laboratory Employees' Union, Inc. [the "Union" or
"ILEU"] filed a grievance against ExxonMobil Research & Engineering Company,
Inc. [the "Company" or "EMRE"] claiming that the Company violated the collective
bargaining agreement [the "Agreement"] when it permanently subcontracted
bargaining unit positions, including materials handler positions.  The Company
denied the grievance and the dispute remained unresolved.  The Union

submitted the dispute to arbitration pursuant to the terms of the parties' Agreement. I was selected as arbitrator by mutual agreement of the parties.

Arbitration hearings were conducted on August 4, 2016 in Branchburg, New Jersey and on October 18, 2017 in Annadale, New Jersey. At the hearings, the parties argued orally, examined witnesses and introduced documentary evidence into the record. Testimony was received from Project Manager Dan O'Rourke, Senior Research Technician and Union President Mike Myers, Senior Research Technician, and Union Vice President Keith Hajkowski, First Line Supervisor Yan Lim, EMBSI and RDSS Human Resources Advisor Devon Taylor, Senior Research Technician Lynda Smith, Downstream Business Advisor Russell Giglio, EMRE GREF OIMS John Helmes and Human Resources Manager Jeffe Lee Mclean. The record was closed upon receipt of post-hearing briefs, which were received on February 20, 2018.


## ISSUES

At the hearings, the parties did not agree on the framing of the issues to be heard and decided.

The Union proposed the following issue:

> Did the Company change its subcontracting practice by permanently filling certain bargaining unit positions with contractors? If so, what shall be the remedy?

The Company proposed the following issues:

> Did the Company violate the collective bargaining agreement in conjunction with contracting out bargaining unit positions? If so, what shall be the remedy?

> Did the Company violate Section 8(a)(5) of the National Labor Relations Act by unilaterally changing its subcontracting practice, i.e. permanently replacing bargaining unit employees with contractors?

The grievance challenges the Company's action in "hiring multiple Materials Coordinators via a 3rd Party for a full time, regular position through JLL." The grievance alleges a violation of the collective bargaining agreement as well as past practice.

The Union asserts that the issue is the permanent subcontracting of bargaining positions while the Company would limit the issue to contracting out of

bargaining unit positions generally. The Company also proposed to address the NLRB charge that has been deferred to arbitration as follows:

> Did the Company violate Section 8(a)(5) of the National Labor Relations Act by unilaterally changing its subcontracting practice, i.e. permanently replacing bargaining unit employees with contractors?

The issue grieved focuses on the replacement of bargaining unit employees with contractors when bargaining unit employees retire. The issue presented by the Unfair Labor Practice charge that has been deferred to arbitration is "whether the Employer changed its subcontracting practice by permanently filling certain bargaining unit positions with contractors." Both parties focus on whether the contract, past practice or National Labor Relations Act (NLRA) was violated by the Company's permanent replacement of bargaining unit employees with contractors. Accordingly, the issue in dispute is framed as follows:

> Did the Company violate the collective bargaining agreement, past practice, or Section 8(a)(5) the NLRA when it permanently filled bargaining unit positions with contractors? If so, what shall be the remedy?

## RELEVANT CONTRACT PROVISIONS

Pertinent provisions of the parties' Agreement provide as follows:

### ARTICLE 1 – RECOGNITION AND COVERAGE

**Section 2**

> Wherever the term "Company" is used in this Agreement, it shall mean EMRE. The Company recognizes the Union as the exclusive representative of all EMRE employees whose job classifications are listed in Exhibit II and who are based at the Clinton, New Jersey facility as covered by this Agreement for the purposes of collective bargaining with respect to rates of pay, hours of employment, and other conditions of employment as provided by the certification of the National Labor Relations Board. Wherever used in this Agreement, words in the masculine gender denote also the feminine gender.

## ARTICLE VIII – ARBITRATION

### Section 1 - What Grievances Are Arbitrable

A dispute as to the interpretation of an express provision(s) of this Agreement or any question of fact arising out of an alleged contract violation of an express provision(s) of this Agreement if not settled through the grievance procedure established by this Agreement may be submitted to an arbitrator as provided herein.

### Section 7 - The Award

B.  The decision of the Arbitrator shall be final and binding on the Company and the Union, unless it is contrary to law, and shall conclusively determine the disputed question for the life of this Grievant, or any renewal or renewals thereof.

C.  No arbitrator shall have the authority to enlarge, modify, rewrite, or alter any of the terms of this Agreement, or of any amendment or amendments thereof.

## ARTICLE XVIII – CONTRACT WORK

The Company may let independent contracts.

At the time a contract is let, involving work customarily performed by employees on or after Jan. 1, 1975, the dollar value of which will be in excess of $50,000, the Company will inform the appropriate Union Delegate of, and discuss the reasons for, the letting of such contract irrespective of whether such work is to be performed on Company premises or elsewhere. The notification will be confirmed in writing by the Division Management involved.

At the time a purchase order is let, involving work customarily performed by employees on or after January 1, 1975, the aggregate cost of which will be in excess of $50,000 in a year, the Company will inform the appropriate Union Delegate of, and discuss the reasons for, the letting of such purchase order irrespective of whether such work is to be performed on Company premises or elsewhere. The notification will be confirmed in writing by the Division Management involved.

In the event a purchase order is let, involving work customarily performed by employees on or after January 1, 1975, the aggregate cost of which is not anticipated to be in excess of $50,000 in a year and it becomes apparent that the aggregate cost of said order will exceed $50,000 in a year, the Company will inform the appropriate Union Delegate of, and discuss the reasons for, the letting of such purchase order irrespective of whether such work is to be performed on Company premises or elsewhere. The notification will be confirmed in writing by the Division Management involved.

However, during any period of time when an independent contractor is performing work of a type customarily performed by employees and employees qualified to perform such work together with all of the equipment necessary in the performance of such work are available in the Company facilities, the Company may not because of lack of work demote or lay off any employee(s) qualified to perform the contracted work.

Furthermore, in the event that employees have been demoted or laid-off because of lack of work, the Company, prior to letting out future contracts involving work customarily performed by employees and provided that all the equipment necessary in the performance of such work is available in the Company facilities, will (1) repromote demoted employees qualified to perform such work, and (2) recall, in accordance with Section 1 of Article IX, laid-off employees qualified to perform such work, provided the employees conduct and the job performance prior to and during such layoff were satisfactory to the Company.

### Side Letter of Agreement
### August 1, 2014

The August 1, 2014 Side Letter raised each of the dollar amounts in Article XVIII from $50,000 to $250,000.

## ARTICLE XXVIII – MANAGEMENT RIGHTS

The Company shall retain all rights of management for facilities covered by this Agreement or pertaining to the operation of the business, except to the extent that such rights are limited by the provisions of this Agreement.

Independent Laboratory Employees' Union and
ExxonMobil Research & Engineering Company, Inc.
Grievance No. 15-190

## BACKGROUND

ExxonMobil's Research and Development organization in Clinton, New Jersey ("EMRE"), supports ExxonMobil Corporation's Upstream, Downstream and Chemical business operations, including 432 laboratories and 92 plants. EMRE is responsible to project 20 to 30 years forward seeking solutions to anticipated energy challenges. EMRE describes its current staffing model as including "core" and "non-core" positions. It considers "core" positions as those that directly impact research and business functions and "non-core" positions as support functions such as security and materials delivery.

At present, the Union represents approximately 165 employees or approximately 25% of all EMRE staff. The bargaining unit has remained approximately the same size, although the number of core positions has increased and the number of "non-core" positions has decreased over the past decade. Project Manager Daniel O'Rourke estimated that the Union is currently composed of approximately 80% research technicians which he characterizes as "core" positions.

The Company's Clinton facility and the Union have a long history of contracting some bargaining unit work. In denying a grievance over contracting at the third step of the grievance procedure, on August 5, 1977, then Vice President R.L. Weeks assured the Union that there was not and would not be in the future "any intent to erode the bargaining unit":

However, I would also like to respond to the Union's concern regarding the Company's intent. I can state positively that there was not in this case, nor will there be in the future, any intent to erode the bargaining unit nor to limit the number of bargainable employees. The action taken by the Mechanical Division was to meet an operational need caused by a combination of factors, including peak work loads, vacations, and lack of available skills. As in all cases, the Company considered various methods to meet the need, including hiring of regular employees, hiring of non-regular employees, rescheduling of work and vacations, and use of contracted services. In this case, the optimum solution included the use of some personnel whose services were supplied by a contractor. While we cannot predict with certainty how long nor how frequently we may need to utilize such personnel, you can be assured that it will only be done when operations require, and in conjunction with, a combined program of employment and uprates of our own personnel.

At the July 8, 2014 Quarterly Meeting between EMRE and the Union, Mr. O'Rourke for EMRE and Mr. Markowski on behalf of the Union, had a discussion

of the Company's intent to contract positions and its obligations to notify the Union. That discussion was memorialized in the meeting minutes as follows:

- A few months ago, GREF changed mailroom and shipping & receiving service providers from Aztec.

- Discussed Services Trainee position at length: Company is no longer hiring individuals as Services Trainees as the Company can hire individuals directly into other positions, such as research technician, without the need to train someone up from a Services Trainee.

- The Company stated that the Services Trainee classification will continue to be a position/option for ILEU members in back down situations or demotions. In situations involving performance cases, the Company has the right to determine whether a low performer can be demoted to the Services Trainee classification.

- Management stated that it had not been following Article XVIII – Contract Work in terms of providing the Union with formal written notification of contracts let in excess of $50,000. Management stated that it would begin doing this effective this month (July 2014) and that the Union would receive a significant amount of paperwork because of the low $50,000 dollar value.

- Management highlighted that this paperwork could be particularly overwhelming with the job families that the Company is moving towards a fully contracted model. Company reminded the Union that these job families are the mechanics, systems technicians, administrative technicians, AV/graphics design/reproduction services, and materials and services.

- The Union stated that it had not raised the issue with Article XVIII previously because the $50,000 dollar value in 1975 does not equate to dollar values in 2014 and that the intent of the language was to provide notification of large contracts.

- Management state that $50,000 in 1975 is over $200,000 when escalated to 2014.

- The Union proposed a side letter to increase the dollar amount associated with when notifying the Union.

- Action Item: Management will draft a side letter with a $250,000 notification level for Article XVIII for ILEU review/approval.

- **Action Item:** Next quarterly meeting will include agenda item to discuss how the notification process in Article XVIII is working.

On August 1, 2014, the parties entered into a Side Letter amending Article XVIII of the collective bargaining agreement to increase the value of independent contracts for which the Company will inform the Union of, and discuss the reasons for, from $50,000 to $250,000 in a year.

In 2015, Materials Coordinator Mike Cicchino retired and the Company posted the materials coordinator position internally. When no current employee applied for the position, it was contracted with Pennforce and presently, a different contractor continues to provide staff for the materials coordinator position. The Company did not provide specific notice to the Union that the position was contracted out in 2015.

Mr. O'Rourke explained

No, the reason we wanted to contract it out -- again, I am probably going to repeat this a few times, and I apologize. But we looked at our staffing strategy and we are looking into staff employees in more of our core roles and we looked at our noncore roles. The stockroom we considered as more of a noncore role. And we have had a number of contractors in the stockroom for many, many years.

And as people have -- as employees have retired from the stockroom, they have been replaced with contractors. We were moving towards the fully contracting model that we had mentioned a number of times, more formally -- most recently in 2013.

For example, when Roy Leonard Darwin, who worked in the stock room and materials handling, retired, he was replaced with a contractor. Mr. O'Rourke explained that an example of contracting out a job family meant that as employees retired, the Company would contract out the mailroom.

According to Mr. O'Rourke, in some instances, the "contractor model" costs the Company more than hiring employees in some instances using a contractor costs the Company less than employees.

Russ Giglio, presently Business Advisor to Downstream Research and Development Operations, worked as Facilities Manager for the Clinton, New Jersey facility from 2008 to 2010. During that period, Global Real Estate Facilities (GREF) determined which positions would remain Union positions and, based on skill levels, which would be contracted out. At that time, those with standardized skills such as mechanics, electricians and trades people were contracted. Mr. Giglio recalled that since he began working for the Company in

1977, janitors, security guards, painters and cafeteria workers have all been contracted, because the Company determined it was not necessary to employ individuals with those skills.  Mr. Giglio characterized the Company's staffing model as follows:

> … [The Company] addresses various skill sets, tasks that are required to do a business and determine whether those skill sets are things that the Company wants to have and instill in their employees, or if these are skill sets that make more sense to go out into [the] market place and get.

Mr. Giglio explained that the Company determined to achieve its staffing model through attrition and that staffing model was communicated to the Union. Mr. Giglio had frequent conversations with John Helmes, who was at the time, the Safety Coordinator and the Union Treasurer.   Mr. Helmes described the message he received repeated from Mr. Giglio when he had a position with the Union about contracting as:

> "He told us on many occasions that at the time we could -- nobody's job is in jeopardy as far as -- whoever is here as an ILEU member could stay as long as you want, but as you go, you will be back filled with a contractor."

On November 11, 2015, the Union filed the following grievance:

> The Company violated the contract by hiring multiple Materials Coordinators via a 3rd Party for a full time, regular position through JLL.   The Company hired two Materials Coordinators into the Stockroom and three into Chemical Handling Per Article 1, Section 2, "the Company recognized the Union as the exclusive bargaining representative of EMRE employees whose job description is listed Exhibit II."  The Materials and Services Coordinator is listed in Exhibit II and was most recently filled by ILEU member John Cicchino prior to retirement in 2015.  The position is covered by the contract.   The Union grieves this practice on behalf of these members and on behalf of any other members similarly situated in the future wherein the Company hires employees for protected jobs through a 3rd party employer.

## POSITIONS OF THE PARTIES

### The Union

The Union argues that the Company seeks approval for its unilateral withdrawal of recognition from some bargaining unit positions. In other words, the Union asserts that the Company seeks authority to unilaterally withdraw recognition from any and all bargaining unit positions and thus to eliminate any and all Union jobs through attrition in its sole discretion. The Union cites Mr. Taylor's testimony that under the Company's reading of the collective bargaining agreement, it could unilaterally declare any of the positions in the recognition clause, including those of research technician, to be non-core and replace them with contractors through attrition. The Union asserts that the Company's view of recognition rests on the Company's own determination of what is core or non-core.

The Union emphasizes that the Company's witnesses were not able to explain how the Company determined which positions were core and non-core. Specifically, the Union points to Mr. Giglio's testimony that he believed core and "non-core" were subjective, as well as Mr. Taylor's testimony relying upon the September 2014 meeting minutes to define which positions were non-core. Similarly, the Union points to Ms. McClain's testimony also relying upon the September 2014 meeting minutes or email to determine which positions were non-core. Given the Company's position that core positions are defined by whatever the Company says are "core", the Union asserts that the Company, by making these decisions and interpreting the collective bargaining agreement, has effectively sought to give itself absolute power to make determinations as to which positions are non-core and thus subject to contracting out. For example, the Union cites the Company's wastewater positions which, according to Mr. Giglio, are important to EMRE's operations because all of the Company's wastewater is processed in a complex operation and are required to operate the Clinton, New Jersey facility. The Union points out that wastewater positions were not identified in September 2014 as positions to be fully contracted out. So, according to the Union, these wastewater positions should be defined as "core" positions. Nonetheless, the Union points out that when a wastewater position became open due to a unit member's retirement, the Company refused the Union's demand to fill the position with a Union employee. In other words, the Union asserts that the Company can simply declare any position to be non-core and thus outside of the reach of the Union, regardless of either the language of the recognition clause or the importance of the position to the Company. The Union maintains that this position renders the recognition clause and the collective bargaining agreement as a whole illusory.

The Union argues that prior arbitration decisions have consistently interpreted relevant contract clauses to not render either a particular clause or the collective bargaining agreement as a whole as illusory and to preclude the

Company from using contractors to erode the bargaining unit.  The Union stresses that prior arbitration awards have placed limits on the Company's ability to subcontract.  The Union cites a September 2016 award from Arbitrator Maher that Article XVIII, Section 2 of the Agreement does not give the Company "the right to unilaterally alter the interpretation of the provisions contained within the CBA."   Independent Laboratory Employees Union, Inc. and ExxonMobil Research Engineering Company, Grievance No. 16-193 at p. 11 (Maher, 2017).

Acknowledging that the authority to use contract employees under Article XVIII is broad, the Union maintains that it is not limitless.  The Union points out that neither the collective bargaining agreement nor Article XVIII reference the concept or erosion of bargaining unit positions through attrition but arbitrators have found that the recognition clause and applicable labor law preclude that.  Further, the Union points to a 1983 arbitration decision where Arbitrator Peter Florey found the Company could not "undermine the bargaining unit in violation of the recognition clause of the Agreement …" or to "… not hire anymore persons into the bargaining unit so that the Union would atrophy by attrition." Independent Laboratory Employees Union, Inc. and ExxonMobil Research Engineering Company, Grievance No. WP-75 at p. 13-14 (Florey, 1983).  The Union points out that Arbitrator Florey held further that there was "… no doubt that the use of agency personnel was in response to a true operational problem and not designed to undermine the bargaining unit in violation of the recognition clause of the Agreement." (Id. at 13)

The Union maintains that the interpretation of Article XVIII to prevent erosion of the bargaining unit is consistent with the intent of the parties and the longstanding practice.  In support, the Union cites then Exxon Vice President R.E. Weeks' response to a 1979 grievance related to subcontracting where he provided "I can state positively that there was not in this case, nor will there be in the future, any intent to erode the bargaining unit nor to limit the number of bargainable employees."  The Union continued to rely upon Mr. Weeks' 1979 statement, with respect to the use of contractor personnel, Mr. Weeks further stated "… you can be assured that it will only be done where operations require, and in conjunction with, a combined program of employment up-rates of our own personnel."

Further, the Union points to another arbitration award interpreting similar contract language in another ExxonMobil collective bargaining agreement where the arbitrator found improper erosion of the bargaining unit where the Company had indicated "that it was going to 'completely staff the laboratory with contractor employees through the attrition of existing bargaining unit personnel.'"   In contrast, the Union points out that where only two lab analysts were contracted out, the Company was found not to have eroded the bargaining unit. ExxonMobil Corp and United Steel Workers Local, 11-470 FMCS Case No. 14-51057-7 (Shapiro 2014).   The Union would compare this case to the ExxonMobil Beaumont Refinery and PACE Local 4-243, FMCS Case No. 01-16115 (Taylor

2013) in that in both situations, neither collective bargaining agreement included any provisions regarding erosion of the bargaining unit.   Another similarity pointed out by the Union in the <u>ExxonMobil Beaumont Refinery</u> award, the Company argued its ability to subcontract under the collective bargaining agreement was limited only by the requirement that it not lay off employees.  The Union notes that Arbitrator Taylor rejected that argument finding that "[t]he Employer's interpretation of the labor management relationship begs the question, particularly bargaining unit integrity and erosion of the BU."  The Union emphasizes that Arbitrator Taylor found contract employees were "performing the same duties as the BU technicians, side by side" with a result to "pirate employees away from the BU."  The Union notes that Arbitrator Taylor found this to be erosion of the bargaining unit that could result in consequences for the refinery-wide bargaining unit and ordered the Company to "[c]ease and desist from assigning work peculiar to BU laboratory technicians to outside Contractor personnel" and to reassign the work to the bargaining unit.  The Union suggests that in this case, as in the <u>Beaumont Refinery</u> case, the Company has specifically acknowledged its intent to contract entire job families within the bargaining unit through attrition of existing bargaining unit personnel.  The Union relies upon the testimony of Mr. Taylor and Mr. O'Rourke that the Company intends to permanently and completely fill certain job categories covered by the recognition clause of the Union's collective bargaining agreement with contractor employees.  The Union emphasizes the Company's acknowledgement that the result would be that the Union would no longer be the bargaining representative for these positions.  The Union emphasizes the Company's acknowledgement that the determination to contract these positions is not related to costs, safety or quality but simply Company preference.

The Union maintains that neither the management rights clause nor the entire agreement clause gives the Company the authority to unilaterally interpret the collective bargaining agreement, including the recognition clause and Article XVIII of the Agreement.  Citing Arbitrator Maher's decision, the Union points to his finding that the management rights clause is limited "to the extent such rights are limited by the provisions of this agreement."  Specifically, the Union points to Arbitrator Maher's finding that the management rights clause is limited by both the recognition clause and by the National Labor Relations Act establishing a bargaining obligation for mandatory subjects of bargaining.  The Union would apply the same rationale in this instance.

The Union maintains that the Company has violated Article XVIII of the parties' Agreement because the contractors hired by the Company are not independent within the meaning of Article XVIII of the collective bargaining agreement.  Citing the Company's acknowledgement that Article XVIII requires that the contract or agency employees be independent and they are not supervised by ExxonMobil employees, the Union cites the Company's contract personnel guidelines which also acknowledge that if an ExxonMobil employee directly supervises a worker or if a third party could not distinguish between the

contract worker and the ExxonMobil employee, the contract worker may be deemed an employee of ExxonMobil. The Union points out this policy is consistent with Federal and State wage and hour law.

The Union emphasizes that there is no dispute that contract employees are being placed in positions working side by side with Union employees who are still in material handler positions doing the same work. Further, the contract employees are placed in permanent positions supervised by and receive instructions from ExxonMobil employees. The Union cites the example of John Cicchino and Leonard Darwin who retired and was replaced by a contract employee who began performing the exact same duties. Both of these individuals reported to ExxonMobil employee Yam Lin, a First Line Supervisor for EMRE Research and Development Support Services. Once those individuals were retired and replaced with contractors, the Union points out those contractors were supervised by Ms. Lin. Under these circumstances, the Union maintains that the contractors are not "independent" under Article XVIII.

The Union asserts that any prior misconduct by the Company in eroding the bargaining unit does not preclude upholding the Union's grievance here. Citing Mr. Giglio's testimony that when he joined the Company in 1977, positions in the Union included janitors, security guards, painters and cafeteria workers and that those positions had all been contracted out by 1980. The Union points out that there is no evidence supporting this claim and the positions are not covered by the current collective bargaining agreement. The Union maintains that to the extent that those positions may have been covered by prior agreements, they were either negotiated out during collective bargaining and not stricken from the recognition clause unilaterally as the Company seeks to do in this case.

The Union also notes that in agreeing to arbitrate this matter under the NLRB's deferral policy, the Company agreed to waive any timeliness defenses and acknowledged that under Article XVIII, Section 3, the parties' prior failure to object to a breach does not constitute a waiver of claims. The Union notes that before the Company's recent push to completely contract out whole job families, the Company was not providing the Union with notices of its contracting activity as required under Article XVIII until July of 2014. The Union claims that the lack of notice, together with the time required to accomplish replacement by attrition, made the gradual change from a bargaining unit position to a fully contracted out position difficult for the Union to detect. The Union also points out that over time arbitrators have chastised the Company for failing to adhere to the notice requirements of Article XVIII. The Union suggests that both the erosion of bargaining unit positions through attrition and the failure to provide timely notice which might have alerted the Union to such conduct were specifically held to be improper in past arbitrations.

At present, the aging work force results in large groups of employees retiring. The Union maintains that the protections guaranteed by prior arbitrations and the collective bargaining agreement are more important under these circumstances.

Citing the Company's argument that it did not breach the recognition clause or the collective bargaining agreement because the Union has not been eroded very much or because the number of Union employees is approximately the same is baseless. The Union cites the award in the Beaumont Refinery matter where the arbitrator held that "… while there was no loss of existing BU laboratory personnel manpower, certainly there would have been an increase in BU lab technician slots had there been no outside contractors." The Union asserts that it is entitled to grow and not merely to remain stagnant. Because the Company's plan is a loss of recognition for entire job families, the Union maintains it can be described as impermissible erosion of the bargaining unit. Pointing out that the Company cannot unilaterally determine it no longer seeks to recognize the Union as the representative for entire job families, the Union emphasizes that it is entitled to grow its membership and permanent loss of job family recognition will result in lost growth and bargaining unit power. Citing Ms. McClain's testimony that there may be an increase in bargaining unit positions in Clinton as a result of the possible closure of the Paulsboro facility, the Union suggests that this is both speculative and independent from the contracting issue.

For these reasons, the Union asks that the grievance be upheld, that the Company be precluded from replacing bargaining unit employees with contract employees where the purpose or effect of the contracting is to permanently replace unionized employees, that the positions should revert to bargaining unit positions and the Company should be required to pay the Union an amount equal to the dues it would have realized from the positions improperly contracted out.

## The Company

The Company argues that Article XVIII provides it with the express right to contract bargaining unit work. The Company emphasizes that it has a long history of contracting work under Article XVIII and that contracted work has been upheld by arbitrators. The Company emphasizes that the parties reaffirmed Article XVIII in a 2014 Side Letter. Further, the Company maintains that it has continued to communicate openly and honestly with the Union about its plans to contract non-core positions while increasing the number of core positions.

Turning to deferred NLRA charge, the Company asserts that it has no duty to bargain because Article XVIII of the collective bargaining agreement constitutes clear and unmistakable waiver and the Union never requested bargaining. Addressing the concept of "unit erosion", the Company maintains that this principle does not apply whereas here, Article XVIII explicitly provides for

the Company to contract work. The Company suggests that the Union's recourse for addressing the scope of the Company's contracting is and was at the bargaining table. Further, even if the concept of "unit erosion" is applied, the bargaining unit has remained stable with core positions increasing.

The Company maintains that the Union bears the burden of proof to show that the Company's use of contractors to perform bargaining unit work is in violation of the collective bargaining agreement. In this instance, the Company asserts that the evidence establishes the Company acted within the scope of its authority under unambiguous contract language that it provided notice to the Union and acted in good faith and that the bargaining unit was not eroded. Under these circumstances, the Company maintains that the Union is unable to meet its burden of proof in this case.

In this case, the Company emphasizes that the collective bargaining agreement does not restrict contracting and instead, Article XVIII explicitly permits the Company to contract bargaining unit work. The Company cites two arbitration awards upholding its right to contract under Article XVIII and the parties reaffirmed the Company's right to contract both in 2013 negotiations and a 2014 Side Letter increasing the contract value when notice is required. The Company emphasizes that the only requirements of Article XVIII and the Side Letter are notice and discussion with the Union when the contract's dollar value exceeds $250,000 and the restriction that the Company cannot demote or lay off employees qualified to perform the work because of lack of work. The Company maintains that it has complied with these requirements. The Company emphasizes the numerous meetings and discussions with the Union about its general plans to contract more non-core positions through attrition and its specific contracting plans. The Company also points out that it also complied with the notice requirements when the contract's dollar value exceeded $250,000. The Company cites emails from Mr. O'Rourke to the Union from 2014 to 2016 and acknowledgement from Mr. Meyers that email notification was sufficient. Further, the Company points out that no employees were laid off or demoted and the positions contracted were vacant due to retirement.

The Company asserts that it acted in good faith and did not erode the bargaining unit. The Company emphasizes that its decision to contract ancillary or non-core positions such as stock room clerks through attrition and to focus on core research and development positions is logical and reasonable. The Company emphasizes that contracting of material coordinator positions did not harm the bargaining unit as the overall size of the bargaining unit has remained stable as the number of core positions has increased. Further, the Company notes that it anticipates a future increase in core positions. In addition to the plain language of Article XVIII, the Company cites arbitration awards including Illinois American Water Co, 117 LA 647, 652 (Suardi, 2002) where the following standard was applied to subcontracting:

"[S]ubcontracting will be allowed if an employer acts in good faith; if it acts for a reasonable business purpose; if its decision does not have the effect of weakening of the bargaining unit and if the decision does not subvert the contract itself.

To that end, the Company emphasizes that it contracts non-core positions for legitimate business purposes rather than to undermine the parties' Agreement.  The Company points out that it retains contractors for non-core positions and more fully utilizes employee resources in employee positions integral to research and development that have a direct impact on business operations. The Company points out that its contracting did not reduce the size of the bargaining unit, lower wages, deny seniority rights or evade any contractual obligations. Citing Mr. O'Rourke's testimony, the Company points out that contract personnel are more expensive than employees and cost did not play a role in the decision to contract out.

The Company points out that its decision to sub-contract the material coordinator positions neither weakened the bargaining unit nor harmed existing bargaining unit employees because non-core positions were filed with contractors only upon employee retirements.  Further, the Company points out that it initially posted vacancies to provide Union members with the opportunity to bid for the open positions and the material coordinator positions were filled with contractors only after Union members did not bid on them.  Emphasizing that no bargaining unit employees have been displaced, laid off, demoted, discriminated against or deprived of work, the Company reiterates that it caused no harm to the bargaining unit or bargaining unit employees.

Turning to the question of deferral, the Company asserts that there was no violation of Section 8(a)(5) of the NLRA.  The Company points out that Article XVIII expressly provides it with the right to contract and even if it did not have the express right to contract, the duty to bargain continues during the term of a collective bargaining agreement only as to subjects not specifically covered in the Agreement and the Company's bargaining obligation would be triggered only when the Union sought bargaining after receiving notice of a change.  In this instance, the collective bargaining agreement gave the Company the right to contract and the Union never requested bargaining and thus any right it might have had to bargain was waived.  The Company asserts that it provided clear and unequivocal notice to the Union of its intent to contract certain non-core positions. The Company cites several conversations between the Company and the Union about contracting out before 2014. The Company cites further its long history of communicating to the Union regarding its intent to contract certain non-core positions including material handling and coordinator positions.    The Company cites the testimony of Mr. O'Rourke and Mr. Taylor that the Union was advised that as employees in non-core positions retired, they would be replaced with contractors. The Company also cites the testimony of Mr. Helms that Mr. Giglio communicated the use of contractors and explained that as Union

members left or retired, those positions would be filled by contractors. Further, the Company again cites the July 8, 2014 Company/Union quarterly meeting where the Company notified the Union's leadership that it was moving to contract out "job families", including materials coordinator positions. The Company emphasizes that after receiving the meeting minutes from the July 2014 meeting, the Union requested a mid-contract amendment to Article XVIII to increase the notification threshold for contracting out from $50,000 to $250,000. At that time, the Company points out, the Union did not grieve, file an NLRB charge or request to bargain.

The Company emphasizes that if the Union wanted to challenge its decision, its only recourse was through bargaining and bargaining was never requested. Thus, the Union waived its right to challenge the contracting. The Company notes that, at that time, the Union did not object to contracting non-core job family positions but asked questions about how the operations would work. The Company emphasizes that once it provided the Union with timely notice of its determination to contract out material coordinator positions, the Union had the burden to request bargaining and it did not do so.

The Company maintains the Union did not prove the allegations either in the grievance or in its charge alleging a violation of Article XVIII. The Company asserts the Union did not prove the Company unilaterally changed its subcontracting language by replacing bargaining unit employees with subcontractors.

Addressing the Union's assertion that contractors are non-regular employees, the Company asserts that contractors are not non-regular employees. Citing the definition of a non-regular employee as "any employee who is not a regular employee is a non-regular employee" (revisit after reading Union's brief).

For these reasons, the Company asserts that it complied with the requirements of Article XVIII and the grievance should be denied.

## DISCUSSION

I have carefully reviewed and considered the arguments and evidence presented by the Company and the Union in support of their positions. The Union has the burden to prove that the Company violated the Agreement when it contracted bargaining unit positions on a permanent basis.

The Company and the Union have a long history both of contracting and of contracting disputes. The language in Article XVIII has been included in the parties' Agreement since at least the 1960s and any evidence concerning the parties' intent or bargaining history as to the development of that language is not

included in this record. Arbitrator Stark, in a 1981 Award, and Arbitrator Florey, in a 1983 Award, recognized the longevity, meaning and limits of the provision.

Arbitrator Stark found that a planned program to contract messengers over a five month period to be the "type of activity …" the parties intended to cover by Article XVIII. In that dispute, the Company contracted messengers to traverse between Exxon affiliated companies, in the Spring of 1980 for a few months while the Company operated three mailrooms. The parties disagreed over whether the notice provision in Article XVIII (then triggered by a $4,000 contract) was violated. In finding that the Company did not comply with the notice requirements of Article XVIII, Arbitrator Stark found that the program to contract messenger work for a several month period as a whole, with a total cost well in excess of the $4,000 minimum in Article XVIII triggered the notice provision regardless of whether individual contracts for individual messengers each reached or exceeded the $4,000 threshold. Arbitrator Stark addressed the difficulty of ascertaining the history of Article XVIII as follows:

> No testimony was offered with respect to the negotiation of Article XVIII, so we cannot say precisely what the parties had in mind when its terms were drawn. It is clearly not a very restrictive provision. Management may subcontract bargaining unit work, although it may not demote or layoff its own employees during the subcontracting period. The requirement to notify and discuss with the Union a subcontracting plan is not onerous. … IMO Exxon Research & Engineering Company and ILEU, Inc., (Stark 1981)

As pointed out by Arbitrator Stark, Article XVIII of the collective bargaining agreement provides a broad right to subcontract, "[t]he Company may let independent contracts." Article XVIII places few explicit limits on subcontracting. In doing so, the contract requires prior notice and discussion of the reasons for subcontracts over $250,000 and that these reasons be confirmed in writing. The chief limitation is that the contract cannot result in demotion or layoff of any employee who "qualifies to perform the contracted work." It is undisputed that no employee was laid off or demoted as a result of the contracting at issue in this proceeding.

In addition to Arbitrator Stark, Arbitrator Florey has acknowledged the breadth of the contract language which provides "the Company may let independent contracts." When Arbitrator Florey addressed a dispute over staffing to address a backlog in the Distribution Control and Manuals Division until a new computer system was operational, he suggested that even this broad language is not without limit. He distinguished between the use of contractors to address an operational problem such as the one in dispute before him and contracting "designed to undermine the bargaining unit in violation of the recognition clause of the Agreement." (Florey Award at 13). Arbitrator Florey also recognized the limitation that the Company "may subcontract bargaining unit

work, although it may not demote or lay off its own employees" during the "period of time" of the subcontract. Arbitrator Florey continued, distinguishing between permitted subcontracting to address an operational need versus that "designed to undermine the bargaining unit."

> … Also, the record leaves no doubt that the use of agency personnel was in response to a true operational problem and not designed to undermine the bargaining unit in violation of the recognition clause of the Agreement. Even with the broad language of Article XVIII, the Company certainly would not take the position that it need not hire any more persons into the bargaining unit so that the Union would atrophy by attrition. (Id. at 13).

Both Arbitrator Stark and Arbitrator Florey recognized the tension between the Company's need to contract for operational reasons and the Union's need to maintain the composition of its bargaining unit. Now the Company's operational interest in focusing on the employment of those who enhance its core mission and functions with the Union's efforts to insure the continued viability of the bargaining unit positions requires analysis of the limits of Article XVIII. The Company has pursued an operational plan to replace employees with contractors in "non-core" positions as employees retire or resign. The Company seeks to retain an employee workforce consisting of "core" employees while permanently contracting other "non-core" positions included in the recognition clause of the parties' Agreement.

For example, the materials and services coordinator and waste water treatment positions were contracted after employees holding the positions retired, the positions were posted internally and no other bargaining unit employees sought the positions. When no one applied for these positions from within the Company, the Company made the operational decision to contract out those positions. These positions are included by reference in the Recognition Clause and the collective bargaining agreement includes their salaries, as well as job descriptions for these positions. The Company has not evinced a plan to fill those positions with employees covered by the collective bargaining agreement at any point in the future. At issue is whether the Company has the authority pursuant to Article XVIII to contract out those positions on a permanent basis. Although Article XVIII was drafted broadly providing the Company with the authority to "let contracts," it was not designed to be without limitation.

As noted above, Article XVIII requires notice and discussion with the Union and prohibits subcontracting in the event of layoff or demotion. Article XVIII expressly limits layoffs or demotion involving contracted work "during any period of time when an independent contractor is performing work of a type customarily performed by employees …" In doing so, Article XVIII expressly limits contracting to "a period of time." By definition, "a period of time" has a start date and an end date. It is during this period of time when a contract is let that

the Company may not lay off or demote bargaining unit members who are performing contracted work.

This clause, taken together with the Recognition Clause which includes all job classifications "listed in Exhibit II and who are based at the Clinton, New Jersey facility," in the bargaining unit limits the Company's ability to subcontract bargaining unit work to "a period of time."   Arbitrator Florey recognized this limitation, rejecting the Union's argument that the Company's right to subcontract was limited to "periods of short duration," but found nonetheless that "the use of agency personnel was in response to a true operational problem and not designed to undermine the bargaining unit." (Florey Award at p. 13).   Although the record does not establish that the Company seeks "to undermine the bargaining unit" by decreasing the size, the Company's focus on what it views as "core" job families versus "non-core" job families, which it plans to contract permanently, serves to undermine the composition and breadth of the bargaining unit and, by doing so, is not authorized by the Agreement.    Permanently eliminating bargaining unit positions by contracting those same positions serves to undermine the bargaining unit.

Permanently contracting positions covered by the Recognition Clause has the effect, over time, as additional positions are contracted permanently, of changing the scope of the Recognition Clause and potentially eroding both the coverage and size of the bargaining unit.  While the concept of unit erosion is not expressly included in the bargaining unit, the Recognition Clause expressly covers all of the job classifications "listed in Exhibit II and who are based at the Clinton, New Jersey facility."  While Article XVIII permits the Company to contract the work performed by these positions without express limitation, these positions remain covered by the collective bargaining agreement and bargaining unit members may work in those positions in the event of demotion or layoff.  As a result, both Article XVIII and the Recognition Clause prohibit the permanent contracting of these positions.

The Management Rights Clause also provides broad rights to the Company allowing it to "retain all rights of Management …"  Those rights are limited only "to the extent that such rights are limited by the provisions of this Grievant."  In this instance, as stated above, Article XVIII and the Recognition Clause limit the Company from contracting bargaining unit work on a permanent basis.  In other words, the limitations inherent both in the plain language of Article XVIII and in the Recognition Clause do not provide the Company with the authority to permanently contract out these bargaining unit positions.

Accordingly, I find that the Company violated the collective bargaining agreement when it permanently filled bargaining unit positions with contractors.[1] Under the circumstances present here, I direct that the Company cease and

---

[1] I need not decide whether the Company committed an independent violation of the duty to bargain pursuant to Section 8(a)(5) of the National Labor Relations Act in this instance.

Independent Laboratory Employees' Union and
ExxonMobil Research & Engineering Company, Inc.
Grievance No. 15-190

desist from the permanent contracting of bargaining unit positions at its Clinton, New Jersey Facility.

## AWARD

The grievance is sustained.  From this day forward, the Company shall cease and desist from permanently contracting out bargaining unit positions at its Clinton, New Jersey facility.


Dated:   May 25, 2018
         Ocean Grove, New Jersey

_____
Joyce M. Klein


State of New Jersey      }
County of Monmouth       }ss:


On this 25th day of May, 2018, before me personally came and appeared Joyce M. Klein to me known and known to me to be the individual described in and who executed the foregoing instrument and she acknowledged to me that she executed same.

_____

Gretchen L Boone
Notary Public
New Jersey
My Commission Expires 8-24-2022
No. 50066778

21